Da1xlop5

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA

 4              v.                      04 Cr. 119 (AKH)

 5   ALYSHA LOPAC,
                                       Conference
 6                 Defendant.

 7   ------------------------------x

 8                                     New York, N.Y.
                                       October 1, 2013
 9                                     2:40 p.m.
     Before:
10
            HON. ALVIN K. HELLERSTEIN
11
                                       District Judge
12

13            APPEARANCES

14

     PREET BHARARA
15        United States Attorney for the
          Southern District of New York
16   NEGAR TEKEEI
          Assistant United States Attorney
17

18   FEDERAL DEFENDANTS OF NEW YORK, INC.
          Attorneys for Defendant
19   BY:  PHILIP L. WEINSTEIN

20

21

22

23

24

25
```

1       (Case called)

2       THE COURT:  We are sentencing Alysha Lopac.

3       MS. TEKEEI:  Good afternoon, your Honor.  Negar Tekeei

4   for the government.

5       THE COURT:  Good afternoon, Ms. Tekeei.

6       MR. WEINSTEIN:  Phil Weinstein for Ms. Lopac.

7       THE COURT:  Mr. Weinstein, hello again.  How are you,

8   Ms. Lopac?

9       THE DEFENDANT:  I'm fine, thank you.

10      THE COURT:  Ms. Lopac, have you reviewed the

11  pre-sentence investigative report?

12      THE DEFENDANT:  Yes, I have.

13      THE COURT:  Have you discussed it with Mr. Weinstein?

14      THE DEFENDANT:  Yes, I have.

15      THE COURT:  Mr. Weinstein, are there any factual

16  errors to report to me?

17      THE DEFENDANT:  No.  But still the opening question is

18  a minor role, your Honor, that was part of the plea agreement.

19      THE COURT:  I'll get to the sentencing guidelines in a

20  few minutes.

21      MR. WEINSTEIN:  That is the only issue.

22      THE COURT:  Does the government have any comments on

23  the facts?

24      MS. TEKEEI:  No, your Honor.

25      THE COURT:  I understand the facts as set out in the

Davidopso

3

1    pre-sentence investigative report.  Mr. Weinstein, let me set

2    the tone.  The first step in sentencing is to analyze the

3    guidelines and their application.  The crime to which Ms. Lopac

4    pleaded is possession with intent to sell marijuana and a

5    conspiracy to distribute marijuana, those two.

6         The background is much more complicated.  There was a

7    trial before me, a multidefendant case involved in the

8    distribution of marijuana involving interstate and I think

9    foreign shipments, I'm not clear on foreign shipments, with

10   incidents in the west side of Manhattan, where Ms. Lopac lived,

11   and in Brooklyn.

12        After trial I held that there should be a new trial

13   with regard to Ms. Lopac.  If my memory is correct, in the

14   context of the new trial Ms. Lopac pleaded guilty.  I accepted

15   the plea on April 4, 2006.  Am I correct basically, Mr.

16   Weinstein?

17        MR. WEINSTEIN:  Yes, your Honor.  Just to fill it out

18   a little, originally she was acquitted of a (b)(1)(A),

19   convicted of a (b)(1)(B) felony.  The Court set aside the

20   (b)(1)(B).  She then pled to a (b)(1)(C).

21        THE COURT:  Thank you.  What is the implication in the

22   mandatory minimum?

23        MR. WEINSTEIN:  The (b)(1)(b) had a 5-year mandatory.

24   The (b)(1)(C) has no mandatory.

25        THE COURT:  There is no mandatory minimum.  Any

1    comments so far, Ms. Tekeei?

2              MS. TEKEEI:  No, your Honor.

3              THE COURT:  The lower of the guidelines obtaining now

4    or as of November 1, 2004, are the ones we use.  I don't think

5    there is anything that comes out of that.

6              Her offense level is measured by the guidelines for

7    marijuana in an amount greater than 60 kilograms but fewer than

8    80 kilograms.  The offense level is 22.  She is entitled to the

9    safety valve under section 5C1.2 and a reduction of 2 under

10   section 2D1.1.  I think the government questions that.

11             To the extent that she may be a minor participant,

12   which Mr. Weinstein urges, there is potentially another 2

13   levels that could be reduced.  I need to get into a discussion

14   with both of you whether she is entitled to the safety valve or

15   whether she is entitled to a reduction for a minor participant.

16             There is also a question whether she should get a

17   reduction for acceptance of responsibility.  There is also a

18   question of whether there should be additions for obstruction

19   of justice and other factors of that nature.

20             Let me do that now.  Let's take the issue under

21   section 5C1.2 first.  Ms. Tekeei.

22             MS. TEKEEI:  Yes, your Honor.  We believe that the

23   defendant appears to meet the criteria under that section.

24             THE COURT:  Could you please speak louder.

25             MS. TEKEEI:  Yes, your Honor.  We believe that the

5

Daidone

1  defendant meets the criteria under that section.

2          THE COURT:  She did not have more than one criminal

3  history point at the time.  There was no involvement by the

4  defendant in violence or threats of violence.  There was no

5  firearm that she possessed.  Others in the conspiratorial ring

6  did possess a firearm, but there is no evidence that Ms. Lopac

7  was involved in the Brooklyn aspects of the conspiracy to the

8  extent that imputation of knowledge should exist to her.

9          There is nothing having to do with death or bodily

10  jury to anyone.  She was not an organizer, manager, leader, or

11  supervisor by any stretch of the image imagination.  What is

12  the fact about truthfully providing up to this time to the

13  government all information and evidence that she has concerning

14  the offense or offenses that were part of the course of conduct

15  to which she pleaded guilty, Mr. Tekeei?

16          MS. TEKEEI:  Your Honor, we believe that, as I said

17  earlier, she meets every subsection of the criteria for this

18  provision.  Perhaps Mr. Weinstein can answer any more specifics

19  about the information that she provided.

20          THE COURT:  Mr. Weinstein.

21          MR. WEINSTEIN:  Your Honor, if the Court recalls from

22  the trial, there were a series of proffer meetings with the

23  government.

24          THE COURT:  I didn't recall that, Mr. Weinstein.

25  Thank you for refreshing my recollection.

Daixlops

1           MR. WEINSTEIN:  She fully proffered before trial.  The

2   government wanted her as a cooperator.  The issue was whether

3   she knew some of the packages she was receiving contained

4   marijuana.

5           THE COURT:  What did she say?

6           MR. WEINSTEIN:  She said she didn't.  The government

7   had Everton Powell, who at the time was her boyfriend, testify

8   as a cooperating witness at trial.  He testified as a

9   government witness, or at least on my cross, that he

10  manipulated her, she was in love with him, he got her to do it,

11  he never paid her a penny, and, his words, she didn't know that

12  the boxes contained marijuana.  The jury didn't believe him.

13          THE COURT:  My understanding at the time, Mr.

14  Weinstein, was that she was probably consciously indifferent to

15  what the packages contained.

16          MR. WEINSTEIN:  It may be true that the jury

17  disbelieved that and convicted on a conscious avoidance.  But

18  the issue in terms of --

19          THE COURT:  You can't say that she didn't come forward

20  and tell what she knew.

21          MR. WEINSTEIN:  Right.

22          THE COURT:  She was candid in that which she did.  She

23  may not have been candid about the frame of mind that she had.

24          I will find that she qualifies for the safety valve.

25          The next issue is whether she is entitled to a role as

1 | a minor participant.  Ms. Tekeei.

2 |      MS. TEKEEI:  Yes, your Honor.  We believe that she is

3 | entitled to a role as a minor participant and we have

4 | stipulated to that as set forth in the plea agreement.

5 |      THE COURT:  I had taken the position before the

6 | sentencing guidelines became advisory that people involved in

7 | the business of distribution need not be fully involved in the

8 | conspiracy to be an important part of the conspiracy.  She was

9 | the person that was used to pick up drugs and distribute the

10 | drugs.  I can't say that she is a minor participant.

11 |      MR. WEINSTEIN:  Your Honor, she picked up packages.  I

12 | don't think there was any evidence that she in fact distributed

13 | drugs.

14 |      THE COURT:  It was part of what she did.  The packages

15 | were being received from other places, being mailed to other

16 | places, as I recall.  She knew that the people that she was

17 | involved with were involved with drugs.  This is a way of

18 | getting drugs.  There is no reason why she should be used to

19 | pick up these drugs.  I feel that she was enough involved to

20 | qualify as something more than a minor participant.

21 |      MR. WEINSTEIN:  But it is also true, your Honor, that

22 | it is rare that somebody is part of a drug conspiracy where

23 | they not only aren't paid anything, which she was not, but in

24 | fact had loaned Everton Powell $1500, never paid back, paid off

25 | his credit card bill.  So rather than earning money, she was

8

1    actually spending it for her boyfriend.

2          THE COURT:  She was enough to be guilty.

3          MR. WEINSTEIN:  Yes, but that doesn't go to minor

4    role.

5          THE COURT:  What did she tell me on the allocution, do

6    you remember?

7          MR. WEINSTEIN:  I don't have the allocution here.  But

8    people in conspiracy are guilty of the conspiracy and still get

9    minor roles.

10          THE COURT:  That's true.  But in order to be guilty of

11   the conspiracy, she had to know that she was picking up drugs.

12          MR. WEINSTEIN:  I think this was a conscious avoidance

13   plea.  I remember, and I don't have it in front of me, there

14   was a legal issue, and I discussed it with the U.S. Attorney at

15   the time, of whether or not they would accept a conscious

16   avoidance plea.  I believe that is what it was in this case.

17   But I haven't looked at the transcript.  It's six years ago.

18          THE COURT:  I am not able to determine that she was a

19   minor participant.  She may have been motivated by love, but

20   she was on facts that made her aware of what she was picking up

21   and bringing to the Federal Express offices.  I can't say that

22   the activities that she performed were not important to the

23   ongoing success of the conspiracy or the substantive crime

24   itself.  I decline to find that she was a minor participant.

25          Should there be an upward adjustment for obstruction

of justice and for her becoming a fugitive?  Ms. Tekeei.

MS. TEKEEI:  Your Honor, as stated in our sentencing submission, we are not seeking an adjustment based on obstruction of justice.

THE COURT:  There was one before, wasn't there?

MS. TEKEEI:  I believe the probation department did recommend an enhancement for obstruction of justice based on information that the defendant provided to probation.  This is prior in 2006, prior to their initial report.

THE COURT:  Do you remember what it was?

MS. TEKEEI:  The information, my understanding is it was health records that she provided to probation that were not real.

MR. WEINSTEIN:  Your Honor, I know the assistant wasn't there, it was provided to pretrial, although it is the same instance, that she missed a meeting and she said she was at the doctor's, which was not true.

THE COURT:  In any event, she should be given obstruction for not appearing in court at the proper time.  I was ready to sentence her at the time.  I think she was in pretty good shape to ask for lenient treatment.  Had you made your customarily effective argument, Mr. Weinstein, you might have persuaded me, probably would have persuaded me.

But things changed when she decided, for whatever reason -- there may have been some good reasons, some bad

1    reasons -- to become a fugitive.  Without telling anyone, she

2    just disappeared and had to be flushed out of Canada.  I think

3    that qualifies for obstruction of justice.  I so find.  Which

4    means we add 2 levels.  Now we are back to 22.

5             Should there be an acceptance of responsibility?

6             MR. WEINSTEIN:  I think, your Honor, and again the

7    prosecutor wasn't here, part of the negotiations was that there

8    wasn't going to be.

9             THE COURT:  There was not going to be?

10            MR. WEINSTEIN:  Was not going to be because of the

11   minor role and the other things.  Those were negotiated over,

12   and that was the government's position and it was acceptable to

13   us, when we negotiated the guidelines.  We had agreed that

14   there would not be acceptance in exchange for the other

15   adjustments.

16            THE COURT:  She would be entitled to acceptance of

17   responsibility.  I can't say I would give her the additional

18   point, because we had to go through a trial, though she did

19   save the government expenses of a retrial.  I think I would

20   give her 2 points for it.

21            How the becoming a fugitive set of facts affects that

22   acceptance of responsibility is something that would definitely

23   counter.  One could argue that by becoming a fugitive, she did

24   the contrary of accepting responsibility.  But she explains

25   that her mother was ill, that there was no one to care for her

11

1    mother, and she felt she owed a very large debt of gratitude to

2    her mother for standing by Ms. Lopac during very troublesome

3    times.

4            I'm going to give her 2 levels.  It nets out to be the

5    same.  So we are at 20.

6            I calculated correctly, Ms. Tekeei?

7            MS. TEKEEI:  Yes, your Honor.

8            THE COURT:  Mr. Weinstein?

9            MR. WEINSTEIN:  Yes.

10           THE COURT:  At level 20.  The criminal history points

11   are zero, right?

12           MR. WEINSTEIN:  Right, yes.

13           THE COURT:  She has no record.  That puts her in

14   criminal history category I.  The spread of custodial

15   punishment is 33 to 41 months followed by 3 years to life

16   supervised release.  Is that right?

17           MR. WEINSTEIN:  I'll not sure.  I'd have to look it

18   up.

19           THE COURT:  I'm not going to give her more than 3

20   years.  Let's say 3 years is the maximum.  I won't give her

21   more than that.  I find that the range of custodial punishment

22   for net offense level 20 is between 33 and 41 months followed

23   by 2 to 3 years of supervised release.  Is there any objection

24   to that?

25           MR. WEINSTEIN:  No.  As the guideline calculation, no.

Desklop6
                                                                    12

1          THE COURT:  Ms. Tekeei?

2          MS. TEKEEI:  No, your Honor.

3          THE COURT:  Now we have to go into the question of

4   3553 punishment to find the just punishment for Ms. Lopac.  I

5   take note that she was detained between December 1, 2003, and

6   December 3, 2003, let's say three days.  She was detained again

7   from July 11, 2013 to today, or almost 3 months.  Let's say

8   that she has 3 months and 3 days of prior detention.  Actually

9   a little less than 3 months.  Let's round it at 3 months.

10         MR. WEINSTEIN:  Your Honor, if you are still doing the

11  detention time, there is something I would add to that.

12         THE COURT:  Yes.

13         MR. WEINSTEIN:  She was arrested in Canada, where she

14  spent 7½ months awaiting extradition, which she consented to.

15  My understanding is she is not entitled to credit for that

16  time.  Although there may be discretion at BOP to provide it,

17  it also comes within the Court's ability to take that into

18  account.

19         THE COURT:  I am not going to exercise discretion on

20  her behalf with regard to those 7½ months.  They are incident

21  to her being a fugitive.  I don't think she is entitled to it,

22  either by law or by grace.  But she is entitled to 3 months.

23         Mr. Weinstein, I will hear you.

24         MR. WEINSTEIN:  I think there are a number of factors,

25  as the Court obviously knows, and I won't go through them by

13

name, on 3553.  What we can say is in terms of specific

deterrence, and I understand she is a fugitive, but there were

no arrests or no crimes for over 7 years while she was living

in Canada, which certainly is a factor to take into account.

Second, and I'll let her speak to this in more detail,

during the time where she was in Canada she was taking care of

her mother.  That has been corroborated by the medical records.

What that entailed obviously is not in the records.  Ms. Lopac

can speak to that.  I think it would be fair to say that it was

pretty difficult doing what she was doing given the kind of

mental illness had mother had.  This was not just taking her to

the doctor.

THE COURT:  Had this all been put before me, she would

have been in line for a minimal sentence with a very cogent

argument about how important her presence in Toronto it would

have been.  What she did was just take it on herself to flee.

She didn't say anything to you, she didn't tell you anything,

didn't ask your advice.  She just left.

MR. WEINSTEIN:  True.

THE COURT:  Pretty much forfeiting any familial

appeal.  What is to say this is the same bad judgment that

caused her to be a prostitute and a dancer at the various men's

clubs and to be involved with a marijuana ring.  She is not a

stupid person.  She could employ her skills in different ways,

yet she didn't.  There is a success of judgments that are

Desktop

14

1    indifferent to law.

2         MR. WEINSTEIN:  She clearly exercised bad judgment,

3    there is no disputing that.  That alone would not be a crime.

4    Plenty of people do that.  It is also important to know that

5    her bad judgment was then manipulated by Everton Powell, who

6    the Court sentenced to 40 months even though he is facing a

7    mandatory 15 years.  He was the leader of this.  He had a gun.

8         THE COURT:  He also was a cooperator.

9         MR. WEINSTEIN:  He was a cooperator, I understand

10   that.  But in terms of the kind of comparative sentence, what

11   they did and what Powell told the Court or told the jury in

12   front of the Court, where he acknowledged that, I think that is

13   a factor to take into account.

14        The Court is clearly left with issues of general

15   deterrence and punishment and all the rest.  I think that the 7

16   years she spent in Canada were fairly difficult years in light

17   of her mother's condition.  Again, I understand that it had

18   gotten worse, by the way, but that is not the sole criteria,

19   over the 7 years.  Her mother did deteriorate.

20        So she wasn't just living high on the hog during those

21   7 years.  She had some pretty difficult times extricating her

22   mother from fairly trying circumstances given that when her

23   mother was manic, she would get herself into a lot of trouble.

24        THE COURT:  Your letter has pointed some of that out.

25        MR. WEINSTEIN:  Yes, I will, because I'm only doing it

Desktop

1   second-hand and she can do it first-hand.  Nevertheless, I

2   think it is a mitigating factor.  For 7 years, there is such a

3   thing as post-offense rehabilitation.  I understand that she is

4   a fugitive, so it is not an exact fit.  But certainly her

5   behavior, there was no other drugs, she has not even been

6   arrested in the 7 years that she was out.  Had she been, there

7   was a warrant out for her, and they probably would have

8   exercised it.  So it was not only probation and no one else

9   could find the warrant, and it just makes sense that it wasn't.

10          THE COURT:  Tell me about this warrant, what you just

11  said about a warrant.

12          MR. WEINSTEIN:  When she left the court, a fugitive

13  warrant was lodged against her.

14          THE COURT:  Right.

15          MR. WEINSTEIN:  She is a dual citizen.  The places

16  they are looking her certainly included Canada, which is she

17  was.  She was in Toronto the whole time.  That is the warrant

18  I'm talking about, as a result of her fleeing from sentence.

19          THE COURT:  Right.

20          MR. WEINSTEIN:  It was out on Interpol.  Had she been

21  arrested even for a traffic offense, I'm going to guess that it

22  would have popped up in the Canadian system.  I will let her

23  explain, because I think she has more to say about the care of

24  her mother.  I will let the Court hear her words on that.

25          THE COURT:  Thank you, Mr. Weinstein.

1          Ms. Lopac.

2          THE DEFENDANT:  When my mom is manic, she is really

3     wild.  She runs around and does all kinds of crazy stuff.  I

4     have for follow her around and make sure she doesn't get into

5     trouble.

6          THE COURT:  Would you push microphone a little closer.

7          MR. WEINSTEIN:  If she could sit down, it may be a

8     little easier.

9          THE COURT:  OK.

10          MR. WEINSTEIN:  She is either manic or depressed.

11     When she is depressed, she stays inside the house, she doesn't

12     bathe, she doesn't clean, she doesn't do anything, she doesn't

13     go anywhere, she doesn't talk to anybody.  Then, when she gets

14     manic, all of a sudden she is out and talking to everybody and

15     acting crazy and driving around.

16          We live in an area where there is a gay neighborhood

17     on one side and drugs on the other.  She will drive around the

18     park in her scooter with her flashlight running up to all the

19     drug users:  What are you doing? selling crack. I'm going to

20     call the cops on you.  Stuff like that.  Make comments,

21     especially the ones in our building, our neighbors.  She causes

22     trouble.  I basically have to follow her around.

23          When she is getting too crazy with somebody, if he

24     wants to hurt her, I have to jump out like Superwoman and say,

25     hey, she is not right right now, she is off her medication, she

doesn't mean what she is saying.

        I hope they don't do anything to her.  I try to get
her to the hospital.  She will come with me.  Mom, you're
obviously not OK, let's go to the hospital.  Then she just
knows all the right things to say to get herself out.  Are you
feeling like this, are you feeling like that?  She says all the
right things, and they don't keep her in there.

        I have to wait until she can get they call it formed,
where they can actually hold her against her will in the
hospital.  But she has to threaten to hurt herself or somebody
else before that happens.  It's just a matter of like whenever
the police do get involved or just whatever she does.

        She will run around with no clothes on or two
different shoes, making friends.  She is a member of a club
called Progress Place that is for people like her.  She called
in a bomb threat there.  She threatened to stab somebody there.
She just is not herself.

        Then, when she snaps out of it or whenever she gets
into the hospital, does her time there, and gets her meds and
has all the levels right, she comes home.  Then nobody wants to
talk to her because of all the crazy stuff she did while she
was manic.  Then she gets depressed again, having no friends,
nobody likes me, nobody's talking to me.  She is too
embarrassed to go anywhere.

        THE COURT:  That is happening now?

18

1          THE DEFENDANT:  She is OK right now.  It usually

2    happens every like three or four years.  That is exactly what

3    was happening when I left.  Then it happened three years after.

4    Then she had a heart attack.

5          THE COURT:  She what?

6          THE DEFENDANT:  She had a heart attack two years,

7    maybe three years ago.  Now it's due again.  I know it's

8    coming.

9          THE COURT:  What's due with her now?

10          THE DEFENDANT:  Pardon me?

11          THE COURT:  What is happening with her now?

12          THE DEFENDANT:  Right now she is on her medication,

13    everything's OK for now.  All my life it happens every three or

14    four years this happens.

15          THE COURT:  You were with her how long, how many

16    years?

17          THE DEFENDANT:  My whole life.

18          THE COURT:  You became a fugitive when?

19          THE DEFENDANT:  In September.

20          THE COURT:  Of what year?

21          THE DEFENDANT:  '06.

22          THE COURT:  You came back 6½ years later.

23          THE DEFENDANT:  Yes.  It never changes.

24          THE COURT:  What happened in the 6½ years?  Were you

25    living with her all the time?

1          THE DEFENDANT:  I saw her almost every day, yes.  She

2     was in a hospital a few more times for her illness, and then

3     she was also in for a heart attack.

4          THE COURT:  What is going to happen if I put you in

5     jail now?

6          THE DEFENDANT:  I don't know.

7          THE COURT:  What's happened in the 3 months that you

8     have been in jail or the 10 months that you have been in jail,

9     counting Canada?

10          THE DEFENDANT:  She's been making it to her

11     appointments.  She is OK.  She takes her meds.  But eventually

12     she gets -- sort of like if you take sleeping pills, they work

13     for a few weeks, and then after that they don't work anymore.

14     That's what happens with her meds.  They always have to find

15     her something else or change her levels or whatever.  It

16     happens every three or four years.

17          THE COURT:  Does she know that you are in jail?

18          THE DEFENDANT:  Yes, she does.  I talk to her like

19     three or four times a day.

20          THE COURT:  How do you think I should take this into

21     account, your experience with your mother?

22          THE DEFENDANT:  I've been dealing with it my whole

23     life.  It just happened at the wrong time.

24          THE COURT:  Do you have any sisters?

25          THE DEFENDANT:  No.

 1          THE COURT:  Brothers?

 2          THE DEFENDANT:  No.

 3          THE COURT:  You are the only one?

 4          THE DEFENDANT:  Yes.

 5          THE COURT:  How old is your mom?

 6          THE DEFENDANT:  64.

 7          THE COURT:  How old are you?

 8          THE DEFENDANT:  42.

 9          THE COURT:  Do you feel you are ever going to have a

10  life for yourself?

11          THE DEFENDANT:  No.  But I don't care.

12          THE COURT:  Why?  Why don't you care?

13          THE DEFENDANT:  Because she is my mom.  It's my job to

14  take care of her.

15          THE COURT:  You can't take care of her unless you take

16  care of yourself.  You can't help another person unless you

17  help yourself first.

18          THE DEFENDANT:  I understand, yes.

19          THE COURT:  That's right, isn't it?

20          THE DEFENDANT:  Yes.

21          THE COURT:  You can't take care of your mom if you're

22  involved with a drug ring in New York City, right?

23          THE DEFENDANT:  Yes.

24          THE COURT:  You can't have much of a life to yourself

25  if you engage in prostitution.

Desklope

1          THE DEFENDANT:  I didn't get to finish school.

2          THE COURT:  What?

3          THE DEFENDANT:  I didn't get to finish school, because

4     of things going on with my mom.

5          THE COURT:  Lots of people are able to manage even

6     though they haven't gone to school.

7          THE DEFENDANT:  Yes.

8          THE COURT:  Lots of people who never go to school at a

9     later time than others and get their degrees later.

10         THE DEFENDANT:  Absolutely.  I have had jobs, I have

11    had good jobs before all this other stuff.

12         THE COURT:  You are a capable and caring person when

13    you want to be, Ms. Lopac.

14         THE DEFENDANT:  Absolutely.  But even the few jobs

15    that I had I couldn't go back to because of my mom's illness.

16    I am not trying to blame my mom.  It's not her fault.  It's

17    just all these things lead up to everything screwing up and

18    nobody's ever going to say no.  They are not going to fire a

19    stripper or prostitute.  I can get fired from many places, but

20    those places will never fire you.

21         THE COURT:  Those places what?

22         THE DEFENDANT:  You can't get fired from being a

23    stripper or prostitute.  I have worked for several places and

24    always had to leave to take care of my mom.  These ones I don't

25    have anybody to answer to.  So when my mom's sick, I just don't

Dehsl-p06                                                                 22

 1    go to work.

 2                THE COURT:  I can't straighten out your life.

 3                THE DEFENDANT:  I know.

 4                THE COURT:  I can't simplify your life.  I have to

 5    believe, though, that if you don't do something for yourself,

 6    you are not going to be able to do anything for your mother.

 7    If you don't do something for yourself that is legal and right,

 8    nothing else will work.

 9                THE DEFENDANT:  Yes.

10                THE COURT:  I wish I could have in a sense an anger

11    with you for having run away from this court, but I don't have

12    it.  I wish that judges would have the ability to be fine

13    social workers as well as judges so they can repair broken

14    lives, but I can't do it.  I can deliver nice-sounding

15    sentiments which you probably think are totally impractical to

16    the conditions of your life.  Yet I believe that if you don't

17    take care of yourself, gain self-respect, do proper, honest,

18    lawful things, you are neither going to be able to take care of

19    yourself or your mother.

20                Bottom line, everybody has to make the best choice he

21    or she can for oneself.  The best choice is not a choice that

22    engages in narcotics or hangs around with people engaged in

23    narcotics or engages in prostitution or strip joints or

24    anything like that.  What is convenient and at hand is not

25    necessarily the sensible thing to do.

1        How do I punish you, Ms. Lopac?  What do I do to get a

2   just punishment that takes into account the seriousness of what

3   you did, the respect that people have to have for the law, the

4   need to deter yourself from future bad conduct, and to deter

5   others from committing crimes like yours?  It's not like adding

6   columns and coming to an answer, because the columns don't

7   match.  You're left with nothing but judgment, and not even at

8   the time rational judgment.

9        I have to sentence you.  I am not going to go below

10  the guidelines, because I think you spoiled your chances to go

11  below the guidelines.  I won't go above the guidelines, either,

12  because by and large I think you are a decent human being who

13  has made a series of really bad judgments.  Maybe you think you

14  are not deserving better, but you are.  But you have to do

15  better for yourself.

16        THE DEFENDANT:  Yes.

17        THE COURT:  I am going to give you 38 months.  It's

18  not the top, it's not the bottom, but it is substantial.

19        The guidelines are 33 to 41, right, Mr. Weinstein?

20        MR. WEINSTEIN:  Yes.

21        THE COURT:  I'm giving her 38.

22        It reflects that what you did was serious.  Whether

23  you were a minor participant or not a minor participant, the

24  important point is that you involved yourself with a gang of

25  people that were involved in narcotics and you had to know what

1    was going on.  It was over an extensive period.  I think it was

2    about 50 packages, 50 deliveries that you picked up and visited

3    Federal Express offices.  I'm sorry?

4            THE DEFENDANT:  I didn't pick up that much.  But it

5    doesn't matter at this point, I guess.

6            THE COURT:  How many times do you think you did it?

7            THE DEFENDANT:  I went two times to Federal Express.

8            THE COURT:  Only two times?

9            THE DEFENDANT:  Yes.

10           THE COURT:  How did I come to 50?  That was in the

11   evidence.

12           THE DEFENDANT:  It being delivered.

13           THE COURT:  To your home?

14           THE DEFENDANT:  Yes, our place of business, yes.

15           THE COURT:  It was where you lived in the '70s and

16   West End Avenue, as I remember.

17           THE DEFENDANT:  I didn't live there.  I lived on

18   123rd.

19           THE COURT:  You got deliveries at 123rd also.

20           THE DEFENDANT:  Yes.  He lived at 76th Street.

21           THE COURT:  You may have gone twice to the office, but

22   there were countless times that people were delivering stuff to

23   your home and you knew that.  Whether you picked them up

24   yourself, they were placed where you lived, and you knew that.

25           THE DEFENDANT:  Yes.

1          THE COURT:  That's how the number 50 comes up.

2          THE DEFENDANT:  Yes.

3          THE COURT:  Where shall she be serving her time, Mr.

4   Weinstein?  Recommendations?

5          MR. WEINSTEIN:  It is women's prison.

6          THE COURT:  Which is at the current time Danbury,

7   unless they moved people.

8          MR. WEINSTEIN:  I don't think Danbury takes women.  I

9   think it's Devon in Massachusetts or West Virginia, the two

10  women's prisons.  I think they were going to close the one in

11  Massachusetts and the senators opposed it because the all the

12  New York City women would end up in West Virginia, away from

13  families.

14          THE COURT:  Shall I recommend --

15          MR. WEINSTEIN:  A Northeast women's prison.

16          THE COURT:  I so recommend a Northeast women's prison.

17  Located?

18          MR. WEINSTEIN:  I think it is in Massachusetts.  I am

19  not a hundred percent sure.

20          THE COURT:  I will just leave it at Northeast women's

21  prison.  Will she gets visits from Toronto?

22          MR. WEINSTEIN:  Yes, hopefully.

23          THE COURT:  From her mother?

24          THE DEFENDANT:  No. it doesn't matter where I go,

25  really, because my mom won't be coming.

          1              MR. WEINSTEIN:  She said her mother can't travel.

          2              THE COURT:  Friends?  Who will be visiting you, Ms.

          3     Lopac?

          4              THE DEFENDANT:  Nobody.  I don't know anybody in the

          5     U.S.

          6              THE COURT:  The recommendation will stand for a

          7     Northeast women's prison.  Somewhere there may be friends who

          8     will come to see you but won't be able to come if you serve in

          9     West Virginia or other points.

         10              The 38 months are concurrent on both counts, followed

         11     by 3 years of supervised release subject to conditions, also

         12     concurrent.  The defendant shall not commit another federal,

         13     state, or local crime.  Defendant shall not illegally possess a

         14     controlled substance.  Defendant shall not possess a firearm or

         15     destructive device.  Defendant shall cooperate in the

         16     collection of DNA.

         17              The 13 standard conditions of supervision are applied.

         18     The defendant shall be subject to random drug testing as

         19     determined by the probation officer.  Defendant shall submit

         20     her person, residence, place of business, vehicle or any other

         21     premises under her control to the conditions of search as

         22     specified in subparagraph 2 on page 36 of the PSR.

         23              Defendant is to report to the nearest probation office

         24     within 72 hours following release from custody.  She will be

         25     supervised by the district of her residence.  There is a

Desktop
27

1    mandatory assessment of $200 which shall be due upon the filing

2    of this judgment.  My opinion is that defendant does not have

3    an ability to pay a fine.  Therefore, one is not ordered.

4         MR. WEINSTEIN:  My request is that Ms. Lopac is a dual

5    citizen, U.S. and Canada.  When she finishes her prison term,

6    she would like to go back to Canada to assist her mother at

7    that stage 3 years from now or whenever it is rather than being

8    supervised in the U.S.  She would still be on supervised

9    release.  It typically happens in cases where people are

10   deported to the Dominican Republic.

11        THE COURT:  If supervised release can be transferred

12   under the jurisdiction of probation departments in or around

13   Toronto --

14        MR. WEINSTEIN:  I don't think so.  I have never heard

15   of it happening that way, although the time period would

16   continue.  She would be on supervised release but she would not

17   be supervised.  If she commits another crime or does anything

18   like that, she would.  As the Court is aware, the factor here

19   is care of her mother.

20        THE COURT:  I would think, Mr. Weinstein, that the

21   Canadian system accommodates probation or something like it the

22   way our system does.  If arrangements can be made to transfer

23   jurisdiction to Toronto or to surrender jurisdiction here to be

24   carried out in Toronto, or something else that would be in the

25   interests of justice, an application could be made to me or, if

1    I'm not here, to my successor to achieve that.

2              MR. WEINSTEIN:  All right.

3              THE COURT:  At this point I don't know where Ms. Lopac

4    will choose to live, and I don't know that she does, either.

5    We will keep the term as I read out.

6              Any comments, Ms. Tekeei?

7              MS. TEKEEI:  No, your Honor.

8              THE COURT:  Anything else, Mr. Weinstein?

9              MR. WEINSTEIN:  Your Honor, I think you have to

10   dismiss.

11             THE COURT:  I will in a minute.  Anything else?

12             MR. WEINSTEIN:  No.

13             THE COURT:  The punishment is so ordered.

14             I advise you, Ms. Lopac, that under the Constitution

15   you have a right to appeal.  You should discuss with Mr.

16   Weinstein if you wish to appeal.  Mr. Weinstein, if you are

17   asked to appeal, I instruct you to do so on a timely basis.

18             Ms. Lopac, if you can't afford a lawyer, a lawyer

19   reason assigned to you to represent you at the expense of the

20   government at every stage of the proceedings.  Do you

21   understand?

22             THE DEFENDANT:  Yes.  Thank you.

23             THE COURT:  Any underlying counts?

24             MS. TEKEEI:  Your Honor, we would move to dismiss any

25   underlying indictments and open counts.

1          THE COURT:  So ordered.

2          Ms. Lopac is in detention now, so she will be

3     remanded.  I think we are finished.  I wish you well, Ms.

4     Lopac.  You have had a tough life.

5          THE DEFENDANT:  Thank you very much.

6          THE COURT:  I have not made it too much easier for

7     you.  But if I can say one thing that will be retained, you've

8     got to find a way to have self-respect and take care of

9     yourself.

10          THE DEFENDANT:  Thank you.

11          (Adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25